IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

Case No. 5:22-CV-449-M

DR. DARCY DANE, individually, and           )
CAROLINA BRAIN CENTER PC,                    )
                                             )
            Plaintiffs/Counter               )
            Defendants,                       )
                                             )          **OPINION AND ORDER**
v.                                           )
                                             )
COMMONWEALTH PARTNERS, LLC                   )
                                             )
            Defendant/Counter                )
            Claimant.                        )
                                             )

        This matter comes before the court on Plaintiffs' motion for partial summary judgment ("Plaintiffs'

Motion") [DE 65] and Defendant's cross motion for summary judgment ("Defendant's Motion") [DE 69].

        For the reasons described below, Plaintiffs' Motion is DENIED and Defendant's Motion is

GRANTED IN PART and DENIED IN PART.

## I.     Statement of the Case

This is a commercial lease dispute between Plaintiffs Dr. Darcy Dane and Carolina Brain Center PC (collectively, "Plaintiffs") and Defendant Commonwealth Partners, LLC ("Defendant").

Plaintiffs first filed suit on October 13, 2022, in the Superior Court of Wake County, North Carolina [DE 1-3].  On November 9, 2022, Defendant removed that action to this court on diversity grounds [DE 1].  After Defendant filed a motion to dismiss [DE 11], Plaintiffs filed the operative amended complaint on December 22, 2022 [DE 14].  The court denied Defendant's motion to dismiss as moot [DE 21].  Plaintiffs bring four claims for relief: (1) breach of contract and/or breach of the implied covenant of good faith and fair dealing (Count 1); (2) fraud in the inducement (Count 2); (3) unfair and deceptive trade practices (Count 3); and (4) punitive damages (Count 4).  *See* [DE 14].  On February 17, 2023, Defendant filed the operative amended answer and brought two counterclaims: (1) breach of contract; and (2) breach of guaranty [DE 24].  Plaintiffs replied to Defendant's counterclaims on March 23, 2023 [DE 31].  Plaintiffs filed their Motion on March 29, 2024, asking the court to find for Plaintiffs on Count 1 and 3 and against Defendant's counterclaims [DE 65].  Defendant filed its Motion on April 1, 2024, asking the court to find for Defendant on its counterclaims and against Plaintiffs' Counts 1–4 [DE 69].  This matter is scheduled for trial in Wilmington, NC beginning April 28, 2025, at 10:00 a.m. [DE 84].

## II.     Undisputed Facts

Dr. Darcy Dane ("Dr. Dane") is the owner, CEO, and Physician of Carolina Brain Center PC ("Carolina Brain").  [DE 66] 1.[1]  In late 2020, Dr. Dane began working with real estate broker Don Cate to locate a new office space for Carolina Brain.  [DE 71] 1.  Around January 2021, Dr. Dane and Mr. Cate identified approximately 4,855 square feet of suitable commercial space ("Space") at a property referred to as "Midtown North," located at 6000 Six Forks Road, Raleigh, North Carolina.  *Id*.  Defendant is the sole

---

[1] All pin cites to materials in the record will refer to the page numbers that appear in the footer appended to those materials upon their docketing in the CM/ECF system, and not to any internal pagination which blends Roman and Arabic numbers.

owner of Midtown North.  [DE 66] 3.  On February 2, 2021, Mr. Cate sent Defendant's leasing agent a Letter of Intent ("LOI") regarding the Space.  [DE 71] 1.  In the LOI, Dr. Dane and Mr. Cate proposed that the lease include a Tenant Improvement Allowance ("TI Allowance") for the Space of $65.00 per square foot.  *Id*. at 2.  A TI Allowance generally helps offset any tenant improvement, or upfit, costs the tenant spends to get the leased space ready for move-in.  [DE 71] 2.  Tenants are usually responsible for any upfit costs exceeding the TI Allowance.  *Id*.  Mr. Cate based the proposed TI Allowance on cost ranges he had discussed with Dr. Dane.  *Id*.  After reviewing the LOI, Defendant agreed to the proposed TI Allowance and entered lease negotiations with Plaintiffs.  *Id*.

Also in February 2021, Dr. Dane asked Callahan Construction & Development Co. ("Callahan Construction") to provide an initial renovation budget for the Space.  [DE 71] 2.  Dr. Dane had used Callahan Construction to create initial renovation budgets for other lease space candidates.  *Id*. at 2–3. Callahan Construction provided Plaintiffs with its first budget for the Space on February 4, 2021, estimating $276,609.00 in upfit costs ("February 4 Budget").  *Id*. at 3; [DE 72-25] 1.  The February 4 Budget did not include any costs associated with HVAC replacement.  *Id*.  Later that month, Callahan Construction created a second budget for the Space estimating $487,873.00 in upfit costs ("February 25 Budget").  *Id*.; [DE 72-26] 1. The February 25 Budget included estimates for new "HVAC/Steel/Roofing" totaling $164,480.00. *Id*.  Both the February 4 Budget and February 25 Budget list Dr. Dane as the "Client."  [DE 72-25]; [DE 72-26].  Plaintiffs requested that Callahan Construction serve as the preferred general contractor for the Space upfit.  [DE 71] 4.  Defendant agreed.  *Id*.

Plaintiffs contemporaneously engaged the architectural firm "iS Design" and its principal, Megan McAuliffe, to inspect the Space for Plaintiffs' needs.  [DE 71] 3.  On February 18, 2021, iS Design sent Mr. Cate a "draft/blockout layout" plan for the Space.  [DE 72-18] 11.  iS Design provided additional draft designs on February 19 and February 25.  *Id*. at 10; [DE 14-1] 27.

In March 2021, iS Design and Callahan Construction contacted the City of Raleigh to secure a May 12, 2021, express review date for any necessary upfit permits.  [DE 71] 4.  On April 7, 2021, Mr. Cate

3

wrote to Ms. McAuliffe that Dr. Dane had approved iS Design to move forward with plans for the Space "asap" so the City could conduct its express review.  *Id.*; [DE 72-18] 6–7.

On April 13, 2021, Carolina Brain entered into a commercial lease agreement with Defendant ("Lease").  [DE 66] 2; [DE 14-1] 1.  That same day, Dr. Dane signed a personal guaranty of the Lease ("Guaranty").  [DE 66] 2; [DE 68-5] 1.  The Lease included Plaintiffs' proposed TI Allowance, set Callahan Construction as the preferred general contractor, and included iS Design's February 25 design plan as Exhibit C, the "Preliminary Demised Premises Plan."  [DE 14-1] 27.

The Lease required that Defendant provide a functioning HVAC system for the Space.  [DE 14-1] 9–10.  If Plaintiffs installed any special equipment that was "incompatible with the [Space's] [HVAC] systems[,]" Defendant had the right to require Plaintiffs to "make any modification to the [Space's] [HVAC] systems" as necessary, with "[a]ll costs expended by [Defendant]" in making these modifications payable by Plaintiffs as "Additional Rent."  *Id.* at 10.  Plaintiffs could also install a "supplemental HVAC system" at Plaintiffs' "cost and expense."  *Id.*

The parties agreed that the Lease "Commencement Date" would not occur until the Space upfit had been substantially completed.  The relevant Lease provision reads as follows at Section 2.01:

> Commencement Date.  The [Space] shall be deemed Ready for Occupancy the date on which [Defendant's] Work (being the [Space upfit] as set forth on Exhibit F attached hereto) shall have been substantially completed . . . . [T]he "Commencement Date" shall be deemed to be one (1) day after the [Space] is Ready for Occupancy . . . .

[DE 14-1] 4.  Exhibit F of the Lease ("Work Letter") details the parties' responsibilities vis a vis completion of the Space upfit.  *Id.* at 30–34.  The Lease did not specify an anticipated date of delivery for the Space. [DE 66] 11.

Defendant was responsible for performing, "at [Plaintiffs'] sole cost and expense . . . the work (the "Work") in the [Space] provided for in the Approved Plans . . . ."  [DE 14-1] 30.  The Work Letter describes "Approved Plans" at 2(b):

> "Approved Plans" shall mean the Plans as and when approved in writing by [Defendant] and [Plaintiffs] . . . [T]he term "Plans" shall mean the

4

> concept plans and professionally stamped construction drawings covering the Work (including, without limitation, architectural, mechanical and electrical drawings for the Work). The Plans shall be subject to [Defendant] and [Plaintiffs'[2]] approval and the approval of all local governmental authorities requiring approval of the Work . . . . [Plaintiffs] shall give its approval or disapproval (giving specific reasons in case of disapproval) of the Plans within five (5) days after delivery of two (2) complete professionally stamped sets to [Plaintiffs].

[DE 14-1] 30.

"Subject to the conditions specified in [the] Work Letter Agreement, [Plaintiffs] [were] entitled to the [TI] Allowance to be applied towards the cost of the Work." *Id*. The Work Letter includes the TI Allowance of $65.00 per square foot, totaling $312,575.00. [DE 14-1] 31. The Work Letter also accounts for potential upfit costs exceeding the TI Allowance. *Id*. at 32. The Work Letter reads in relevant part:

> Payment of Costs in Excess of Allowance. (a) Prior to the commencement of the Work, [Defendant] shall submit to [Plaintiffs] an estimated cost for the Work. To the extent the estimate exceeds the [TI] Allowance, [Plaintiffs] shall immediately deposit one hundred and ten percent [of the] amount by which the estimate exceeds the [TI] Allowance with [Defendant] ("Allowance Overage Deposit") . . . .

*Id*. If Plaintiffs ever failed to make a required Allowance Overage Deposit, that failure would "constitute a default under the Lease[.]" *Id*. at 33.

The Work Letter details a series of conditions to the "commencement of the Work" on the Space. [DE 14-1] 30. Specifically, Defendant must submit to Plaintiffs for review and approval:

> (i)     A construction schedule containing the major components of the Work and the time required for each, including the scheduled commencement date of construction of the Work, milestone dates and the estimated date of completion of construction.
> (ii)    A detailed statement of estimated construction cost, including fees for permits and architectural and engineering fees.
> (iii)   Plans . . . for the Work based on the space plan in Exhibit C of the Lease, which Plans shall be subject to [Plaintiffs'] approval, as provided below. [Defendant] will update such information and items by notice to Tenant of any changes.

---

[2] Dr. Dane is not a signatory to the Lease. However, she owns Carolina Brain and signed the Guaranty. [DE 66] 1; [DE 68-5] 1. Thus, for purposes of this order the court will frequently refer to "Plaintiffs'" rights and obligations under the Lease.

5

*Id.*

In compensation for overseeing the Work, Defendant was entitled to a "supervisory fee in the amount equal to five percent (5%) of (i) the [TI] Allowance, and (ii) any additional direct cost of materials and labor that exceeds the Allowance for the Work." [DE 14-1] 30.

Construction began at the Space sometime after execution of the Lease. [DE 66] 4. On April 14, 2021, Dr. Dane sent an email to Matt Callahan of Callahan Construction and Ms. McAuliffe regarding upfit plans which reads in part, "I think in the [Space] rooms we were doing ceiling tiles but keeping it open everywhere else. (?)" [DE 72-15] 1. Ms. McAuliffe thanked Dr. Dane for her "feedback" and responded that she "would need to check with the engineers on how the fee is effected with the open ceiling. Open ceiling concept is typically a 15%-20% bump in fee." *Id.*

Two weeks later, Ms. McAuliffe emailed Dr. Dane and Mr. Callahan a "FEE PROPOSAL" for the Space with an "updated [ ] fee with the increase from the open-to-ceiling design for the open area . . . ." [DE 72-17] 1. Ms. McAuliffe stated that "[t]here is always additional design cost associated with open ceiling especially because the HVAC design is much more intense than existing grid/HVAC that is remaining in place." *Id.*

In or before April 2021, Plaintiffs hired engineering consultant Bass, Nixon & Kennedy Inc. ("BNK") to assist iS Design with finalizing design plans for the Space. [DE 71] 5. On April 28, 2021, Taine Mergenthaler of BNK emailed Ms. McAuliffe an evaluation of the existing HVAC and Remote Terminal Units ("RTUs") serving the Space. [DE 72-16] 5–8. Mr. Mergenthaler wrote that "RTU-6 looks like it is part of the original building construction (1982) and does not have outside air capabilities. We will need to replace this unit." *Id.* at 6. He also stated that "3 other rooftop units that serve this portion of the building . . . look like they've seen better days." *Id.* at 7.

On April 29, 2021, Ms. McAuliffe emailed Defendant's leasing agent, Bill Aucoin, asking him to review BNK's evaluation of the HVAC and RTUs. [DE 72-30] 8–12. Mr. Aucoin forwarded this correspondence to Defendant's CEO, Frank Csapo. [DE 71] 5. On May 6, 2021, Defendant stated that it

wanted to "proceed with a different [HVAC] plan," relieved BNK from the project and proceeded to hire a different engineering firm to assist going forward. *Id*. Defendant did not inform Plaintiffs directly of its decision to proceed with a different plan. [DE 66] 9.

On May 7, 2021, iS Design submitted its design plans to the City of Raleigh for review. [DE 71] 6 (citing [DE 72-20]). The City provided comments on May 17, 2021 (collectively, the "May Plans"). *Id*.

Dr. Dane reached out to Defendant on May 25, 2021, asking for a move-in date for the space. [DE 71] 6. Defendant responded that "pinpointing an exact 'move-in' date at this time is difficult[,]" but suggested that Dr. Dane "place orders for furniture for delivery after September 30th[, 2021]." [DE 72-21] 1.

On some date between the execution of the Lease and July 7, 2021, Defendant entered into an oral agreement with Barrister Construction Corporation ("Barrister Construction") to manage the Space upfit. [DE 66] 6. Mr. Csapo is the only member of Barrister Construction. *Id*. at 2. Barrister Construction and Callahan Construction executed a Standard Form of Agreement between Construction Manager and Contractor on July 6, 2021 ("Contractor Agreement"). [DE 72-28]. The Contractor Agreement described the "project scope" of the "Work" as "[iS Design] plans titled Carolina Brain Center-Dr. Dane 5974 Six Forks Road, Raleigh, NC bearing job No.21AYDRDANE . . . ." *Id*. at 3. The "[iS Design] plans" in the Contractor Agreement refer to the May Plans. *Id*. (identifying plans dated May 7, 2021 and May 17, 2021). The Contractor Agreement also contains an updated budget from Callahan Construction, dated June 16, 2021 ("June 16 Budget"). *Id*. at 6. The June 16 Budget totals $313,049.00 and does not include any costs associated with "[n]ew HVAC equipment, roofing, structural or roof screening." *Id*.

Callahan Construction created an additional budget, dated June 29, 2021, totaling $418.485.00 ("June 29 Budget"). [DE 72-27]. The June 29 Budget "includes New HVAC equipment, roofing, and electrical." *Id*. Both the June 16 Budget and the June 29 Budget list Dr. Dane as the "Client." [DE 72-28] 6; [DE 72-27].

On July 21, 2021, Defendant emailed Jon Landrum from "studio forty," a local architectural firm

7

for help replacing BNK's Mechanical, Electrical and Plumbing ("MEP") drawings for the Space. [DE 72-31] 4. Defendant expressed its preference for "three 5-Ton [RTUs]" rather than BNK's proposed "7 & ½ Ton unit . . . , 3-Ton unit, and [] 2-Ton unit." *Id*. Defendant stated that "[w]e are on a tight schedule as construction [at the Space] has already started." *Id*. In his response, Mr. Landrum noted that "[i]t sounds like the project would need to go back through [City of Raleigh] permitting though . . . ." *Id*. at 2. After consulting with studio forty, Defendant engaged an additional engineering firm, Barrett Woodyard & Associates ("Barrett Woodyard"). [DE 71] 7. BNK and Barrett Woodyard exchanged information about the preexisting MEP drawings and Defendant's proposed changes, but Defendant "want[ed] no further dealings with BNK" and asked Barrett Woodyard to "proceed with [their] engineers and just resubmit the entire [plan] package" to the City. [DE 72-32] 2. Defendant officially engaged Barrett Woodyard in September 2021 to redesign the MEP plans. [DE 68-29].

On July 23, 2021, Callahan Construction sent Plaintiffs a construction schedule for the Space upfit detailing (1) tasks, (2) duration of each task, (3) start date of the task, and (4) projected finish date of each task ("Construction Schedule"). [DE 72-19]. The Construction Schedule does not mention any HVAC replacement. *Id*.

The parties' relationship began rapidly deteriorating in late August. On August 23, 2021, Mr. Aucoin emailed Plaintiffs and Callahan Construction that "October 1 [was] not an option for 'move-in.'" [DE 72-22] 11–12. Mr. Aucoin stated that the upfit had run into a "number of variables [including] [COVID-19 related] supply chain back-orders." *Id*. at 11. Mr. Aucoin estimated the new move-in date as November 15, 2021, at the earliest. *Id*. Dr. Dane energetically objected to the change of move-in date. *Id*. On August 25, 2021, Mr. Csapo responded to the same email chain and stated Defendant would not provide Plaintiffs with a move-in date until they "paid [their] [A]llowance [O]verage [Deposit] in full." *Id*. at 3.

Defendant prepared updated budgets for the Space upfit on August 31, 2021, totaling $415,774.70 ("August Budget"). [DE 72-29] 9. The August Budget was the first time Defendant directly informed Plaintiffs of the changes to BNK's original MEP plans. [DE 66] 10. The August Budget includes costs for

architectural or engineering fees, permitting fees, and HVAC replacement. [DE 72-29] 9. Callahan Construction prepared an additional updated budget dated October 4, 2021, totaling $425,125.00 ("October Budget"). *Id*. at 8. The October Budget includes costs for HVAC replacement. *Id*. Dr. Dane is listed as the "Client" on the October Budget. *Id*.

Defendant continued to seek vendors to supply and install new RTUs for the Space through November 2021. [DE 68-23]. The preexisting RTUs and Defendant's preferred replacement RTUs for the Space both totaled 15 tons. [DE 66] 12.

Plaintiffs never made any Allowance Overage Payment to Defendant. [DE 71] 8. The Space upfit was never completed. [DE 66] 11.

On May 22, 2022, Defendant sent Plaintiffs a Notice of Default, citing Plaintiffs failure to make the Allowance Overage Deposit. [DE 72-24]. Defendant terminated Plaintiffs' right to occupy the Space on July 12, 2022. [DE 66] 11. Plaintiffs initiated this suit on October 13, 2022. [DE 1-3].

### III.   Legal Standard

A party moving for summary judgment on a claim or defense bears the burden of "show[ing] that there is no genuine dispute as to any material fact and [that] the movant is entitled to judgment as a matter of law" on that claim or defense. Fed. R. Civ. P. 56(a). Within the meaning of Rule 56: (1) a fact is "material" if a jury's decision regarding the fact's existence or nonexistence "might affect the outcome of the suit under the governing law"; and (2) a dispute about a material fact is "genuine" if the "evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986).

The movant "bears the initial responsibility of informing the district court of the basis for its motion and identifying those portions of [the record] which [the movant] believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). The movant may demonstrate the absence of a genuine dispute of material fact by: (1) "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or

declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials[,]" Fed. R. Civ. P. 56(c)(l)(A); or (2) showing that the record "do[es] not establish the absence or presence of a genuine dispute, or that [the nonmovant] cannot produce admissible evidence to support the fact[,]" Fed. R. Civ. P. 56(c)(l)(B).

The Fourth Circuit has said:

> When the moving party has carried its burden, the nonmoving party must come forward with evidence which shows more than some metaphysical doubt that genuine and material factual issues exist. A mere scintilla of evidence presented by the nonmoving party is insufficient to circumvent summary judgment. Rather, the nonmoving party must convince the court that upon the record taken as a whole a rational trier of fact could find for the nonmoving party.

*Austin v. Clark Equip. Co.,* 48 F.3d 833, 836 (4th Cir. 1995) (citations omitted). Rule 56(e) "requires the nonmoving party to go beyond the pleadings" and, pursuant to Rule 56(c), to "designate specific facts showing that there is a genuine issue for trial." *See Celotex,* 477 U.S. at 324 (quotation marks omitted).

Where the district court concludes that—based upon the record taken as a whole, when viewed in the light most favorable to the nonmovant as described above—a reasonable jury could render a verdict in favor of the nonmovant, summary judgment must be denied. *Anderson,* 477 U.S. at 248. Where, in light of the same, the court concludes that a jury could not reasonably render a verdict in the nonmovant's favor, summary judgment may be granted. *Id.* at 249–50.

## IV. **Plaintiffs' Motion**

Plaintiffs seek summary judgment on Plaintiffs' Count 1 (breach of contract and/or bad faith) and Count 3 (unfair and deceptive trade practices), as well as on Defendant's two counterclaims.[3] [DE 65].

### A. *Breach of Contract*

Plaintiffs allege that Defendant breached the Lease in the following ways:

---

[3] The court will consider Plaintiffs' Count 3 (unfair and deceptive trade practices) and Defendant's counterclaims in its analysis of Defendant's Motion.

a. Failing to provide the Plaintiffs with any budget for the costs associated with the upfit of the Space beyond the original amounts provided to the Plaintiffs, [DE 14] 11 ¶ 49(a);

b. Failing to inform the Plaintiffs that the costs associated with the upfit of the Space would exceed the TI Allowance, *id*. at ¶ 49(b);

c. Failing to secure Plaintiffs' agreement in advance of the commencement of construction to pay any amounts in excess of the TI Allowance, *id*. at ¶ 49(c), (h), (i);

d. Seeking to collect an Allowance Overage Deposit from Plaintiffs, *id*. at ¶ 49(e), (f);

e. Stopping work on the upfit of the Space unless the Plaintiffs agreed to pay an Allowance Overage Deposit, *id*. at ¶ 49(d), (g).

Under North Carolina law, "[t]he elements of a claim for breach of contract are (1) existence of a valid contract and (2) breach of the terms of that contract." *Poor v. Hill*, 138 N.C. App. 19, 26, 530 S.E.2d 838, 843 (2000) (citation omitted); *see Wells Fargo Ins. Servs. USA, Inc. v. Link*, 372 N.C. 260, 276, 827 S.E.2d 458, 472 (2019) (per curiam). The court interprets the provisions of a lease according to general principles of contract law. *RME Mgmt., LLC v. Chapel H.O.M. Associates, LLC*, 251 N.C. App. 562, 567, 795 S.E.2d 641, 645 (2017) (citing *Martin v. Ray Lackey Enters., Inc.*, 100 N.C. App. 349, 354, 396 S.E.2d 327, 330 (1990)).

"Interpreting a contract requires the court to examine the language of the contract itself for indications of the parties' intent at the moment of execution." *State v. Philip Morris USA, Inc.*, 359 N.C. 763, 773, 618 S.E.2d 219, 225 (2005) (citation omitted). "If the plain language of a contract is clear, the intention of the parties is inferred from the words of the contract." *Walton v. City of Raleigh*, 342 N.C. 879, 881, 467 S.E.2d 410, 411 (1996) (citation omitted). "When the language of a contract is plain and unambiguous then construction of the agreement is a matter of law for the court." *Whirlpool Corp. v. Dailey Constr., Inc.*, 110 N.C. App. 468, 471, 429 S.E.2d 748, 751 (1993) (citation omitted). In such a case, "the court may not ignore or delete any of [the contract's] provisions, nor insert words into it, but must construe the contract as written, in the light of the undisputed evidence as to the custom, usage, and

meaning of its terms." *Hemric v. Groce*, 169 N.C. App. 69, 76, 609 S.E.2d 276, 282, cert. denied, 359 N.C. 631, 616 S.E.2d 234 (2005) (quotations omitted).

"[I]f the writing itself leaves it doubtful or uncertain as to what the agreement was, parol evidence is competent . . . to show and make certain what was the real agreement between the parties; and in such a case what was meant, is for the jury, under proper instructions from the court." *Jefferson-Pilot Life Ins. Co. v. Smith Helms Mulliss & Moore*, 110 N.C. App. 78, 82, 429 S.E.2d 183, 186 (1993) (quoting *Root v. Allstate Ins. Co.*, 272 N.C. 580, 590, 158 S.E.2d 829, 837 (1968)).

There is no dispute that the Lease is a valid contract between the parties. Whether or not Defendant breached the Lease hinges on two questions. First, which party was responsible for HVAC costs associated with the Space upfit. And second, were Plaintiffs obligated to pay an Allowance Overage Deposit. The court considers each question in turn.

  i.    Duty to Pay for New HVAC

Issues of material fact preclude the court from determining the party responsible for new HVAC costs associated with the Space upfit.

In Plaintiffs' view, Defendant used the Space upfit as a pretense to pass along the costs of replacing the failing HVAC system to Plaintiffs even though it was Defendant's obligation to provide functioning HVAC equipment and services under the Lease. [DE 67] 3. Defendant counters that but-for Plaintiffs' "open-to-ceiling" redesign to the Space, the preexisting HVAC system could have stayed as is for some time. [DE 73] 7 (citing [DE 72-17] 2). In Defendant's view, Plaintiffs' proposed plan for the Space upfit mandated replacing the HVAC system before its useful life had elapsed, thus the responsibility for those costs shifted to Plaintiffs. *Id.*

The Lease required that Defendant provide a functioning HVAC system for the Space. [DE 14-1] 9–10. Prior to the execution the Lease, the Space was served by several RTUs (totaling 15 tons). [DE 66] 12. The Lease further specified that if Plaintiffs installed any special equipment that was "incompatible with the [Space's] [HVAC] systems[,]" Defendant could require Plaintiffs to "make any modification to

12

the [Space's] [HVAC] systems" as necessary, with "[a]ll costs expended by [Defendant]" in making these modifications payable by Plaintiffs as "Additional Rent" ("Special Equipment Modification"). [DE 14-1] 10. Plaintiffs could also install a "supplemental HVAC system" at Plaintiffs' "cost and expense" ("Supplemental Modification"). *Id.*

The functionality of the preexisting HVAC is disputed. Defendant had begun replacing existing HVAC systems at the Midtown North property on a rolling basis to uniform 5-ton RTUs. [DE 66] 11; [72-3] 63–64. Additionally, Plaintiffs' retained engineers at BNK inspected the original HVAC and identified at least one RTU that required replacement and three others that had "seen better days." [DE 72-17] 5–6. Ms. McAuliffe of iS Design forwarded this information to Mr. Csapo, who responded that Defendant would "want all of those old units replaced with two (2) new 5-ton [RTUs]." [DE 72-30] 7–12. BNK did not opine that the entire HVAC system was defunct. [DE 72-17] 5–6. Eventually, Defendant would reject BNK's proposed HVAC plan for the Space and hire Barrett Woodyard to create new plans incorporating uniform 5-ton RTUs like those used elsewhere at the building. [DE 68-29]; [DE 66] 12.

Yet prior to BNK's inspection of the RTUs, Dr. Dane purportedly changed the plans for the Space upfit by requesting an open-to-ceiling design for the Space open area. [DE 71] 5; [DE 72-15] 2; [DE 72-17] 2. Ms. McAuliffe told Dr. Dane in April 2021 that "[t]here is always additional design cost associated with open ceiling especially because the HVAC design is much more intense than existing grid/HVAC that is remaining in place. I wasn't aware of that design element initially . . . ." [DE 72-17] 2. The May Plans submitted for express review contain several drawings related to RTUs.[4] [DE 72-20]. And evidence in the record at least partially substantiates Plaintiffs' awareness of the contents of the May Plans. *See* [DE 72-1] 87–88 (Mr. Callahan stated that "Dr. Dane told us to [submit the upfit plans for express review].").

---

[4] The court cannot determine to what extent, if any, the May Plans (and BNK's MEP drawings) account for new RTUs. On the one hand, Ms. McAuliffe informed Mr. Csapo via email on May 5, 2021, that "no structural engineering or [RTU] screening design was included/planned [in the submission to the City]." [DE 72-30] 2–3. On the other hand, Defendant sent studio forty the "permitted set of plans" for the Space upfit on July 21, 2021, noting that "[BNK's] MEP drawings [containing new RTUs with alternative tonnage] were rejected" because of Defendant's preference for "three 5-ton units." [DE 72-31] 5.

13

Considering the evidence, a reasonable jury could infer that without the open-to-ceiling change, the preexisting RTUs could have continued operating for some time. *See Anderson,* 477 U.S. at 248.

In Plaintiffs' view the state of the HVAC system is irrelevant—it was always the intent of the parties that Defendant would replace whatever HVAC infrastructure required to make the Space functional. [DE 67] 1–2. "When an agreement is ambiguous and the intention of the parties is unclear, . . . interpretation of the contract is for the jury." *Variety Wholesalers, Inc. v. Salem Logistics Traffic Servs., LLC*, 365 N.C. 520, 525, 723 S.E.2d 744, 748 (2012) (citing *Schenkel & Shultz, Inc. v. Hermon F. Fox & Assocs.*, 362 N.C. 269, 273, 658 S.E.2d 918, 921 (2008)).

Central to Plaintiffs' argument is their alleged lack of knowledge regarding new HVAC costs. Plaintiffs cite to the February 4 Budget created by Callahan Construction totaling $276,609.00, which Plaintiffs purportedly relied on when negotiating the TI Allowance. [DE 14] 7, 9. The February 4 Budget does not contain any HVAC replacement costs. *Id.* Plaintiffs state they would have never agreed to the Lease if estimated upfit costs exceeded the TI Allowance. *Id.* at 9. Plaintiffs purportedly never received any of the other budgets prepared by Callahan Construction, including those that accounted for replacement HVAC (i.e., the February 25 Budget and June 29 Budget). [DE 66] 4, 7; [DE 72-25] 1.[5] In Plaintiffs telling, Defendant's August Budget, which included costs for new RTUs, was the first time Plaintiffs learned that the estimated upfit costs exceeded the TI Allowance. *Id.* at 10; [DE 72-29] 9.

On the other hand, Plaintiffs' own architect advised that if they wished to pursue an open-ceiling concept, they could expect "additional design cost . . . especially because the HVAC design is much more intense than existing grid/HVAC that is remaining in place." [DE 72-17] 2. Thus, even assuming Plaintiffs' ignorance of any cost estimates over the TI Allowance before August 2021, [DE 66] 10, a reasonable jury could determine that Ms. McAuliffe's April email gave Plaintiffs' notice that some additional HVAC upfit

---

[5] At his deposition, Mr. Callahan could not recall specifically sending the February 25 Budget, June 16 Budget, or the June 29 Budget to Plaintiffs, but stated that he normally "would have" and "would think I'd sent it to everybody involved." [DE 72-1] 49 (answering question about February 25 Budget).

costs were likely and, logically, those costs were not reflected on the February 4 Budget. Moreover, it is undisputed that Mr. Callahan created at least two budgets (the February 25 Budget and June 29 Budget) that accounted for HVAC costs and exceeded the TI Allowance. [DE 72-27]; [DE 72-28] 6. Plaintiffs claim they never received these, but Mr. Callahan said at his deposition that he normally "would have" sent them to Plaintiffs. [DE 72-1] 49. And Plaintiffs admit they "communicated regularly" with Callahan Construction throughout 2021. [DE 71] 5. Faced with conflicting evidence "on the factual matter bearing on contractual intent," the court cannot find summary judgment for Plaintiffs. *Variety Wholesalers, Inc*, 365 N.C. at 525.

Though not necessary to the court's ruling, the Lease is also ambiguous as to how costs for new HVAC (required by the open-ceiling plan) would be borne by Plaintiffs. A contractual ambiguity exists where the language of a contract is reasonably susceptible to multiple constructions. *RME Mgmt.*, 251 N.C. App. at 568 (citations omitted); *see Fredeking v. Triad Aviation, Inc.*, 647 F. Supp. 3d 419, 440 (M.D.N.C. 2022). Juries resolve contractual ambiguity. *See Whirlpool Corp.*, 110 N.C. App. at 471*; Intersal, Inc. v. Wilson*, No. 15 CVS 9995, 2024 WL 4009215, at *4 (N.C. Super. Aug. 30, 2024). Here, several Lease provisions potentially apply. Under one plausible reading, new HVAC costs would fall under the scope of "Work" detailed in the Work Letter. [DE 14-1] 30. The scope of Work is "provided in the Approved Plans" and ultimately completed at Plaintiffs' "sole cost and expense[,]" [DE 14-1] 30. And BNK, the engineering firm retained by Plaintiffs architect, created plans for a replacement HVAC system, including new RTUs.[6] [DE 72-20]; [DE 72-30] 2. On the other hand, new HVAC could fall under Section 6.03 "Special Equipment," as either: (1) a "supplemental HVAC system"; or (2) a "modif[ied]" HVAC system because of Plaintiffs' special equipment.[7] [DE 14-1] 10. The specific category matters. If the new HVAC qualifies as Work it would be paid by the TI Allowance but also subject to the Allowance Overage Deposit

---

[6] As discussed further below, whether the May Plans or any plans associated with the Space upfit ever became Approved Plans under the Work Letter presents another live issue of material fact.
[7] Section 6.03 specifies that "[s]pecial [e]quipment" includes "any lights, machines or equipment, including but not limited to computers[.]" [DE 14-1] 10.

requirement.  [DE 14-1] 30–34.  If the new HVAC qualifies as "Special Equipment" Plaintiffs would pay it as "Additional Rent," whereas Section 6.03 only states that installation of "supplemental HVAC . . . shall be at [Carolina Brain's] cost and expense[.]"  *Id.*

In sum, the record contains conflicting evidence on the preexisting HVAC system's functionality and the parties' intent regarding the responsibility for HVAC replacement.  [DE 14-1] 9.  Accordingly, the court cannot determine which party had a duty to pay for the replacement HVAC system as a matter of law.  *Anderson,* 477 U.S. at 248; *see also Variety Wholesalers, Inc.*, 365 N.C. 520 at 525.

ii.    Allowance Overage Deposit

The parties further dispute whether Plaintiffs were ever required to make an Allowance Overage Deposit.  In Plaintiffs' telling, Defendant improperly demanded an Allowance Overage Deposit before satisfying the conditions precedent set out in the Work Letter.  [DE 14] 11.  Questions of material fact prevent the court from making this determination.

The court begins by examining the plain language of the contract for indications of the parties' intent.  *See State v. Phillip Morris USA, Inc.*, 359 N.C. at 773 (citations omitted).  The Work Letter unambiguously provides that before "commencement of the Work," certain conditions must be met.  [DE 14-1] 30.  *Id.*  Specifically, Defendant must send to Plaintiffs, for "review and approval":

(1)    A construction schedule containing the major components of the Work;

(2)    A detailed statement of construction cost; and

(3)    Plans for the Work subject to Plaintiffs' approval.

[DE 14-1] 30.  Defendant is also required to update these items by notice to Plaintiffs of any changes.  *Id.*  The parties dispute whether any of these conditions were met.  *See* [DE 67]; [DE 70].

Plaintiffs are obligated to make an Allowance Overage Deposit if, per the Work Letter: "[p]rior to commencement of the Work, [Defendant] submit[s] to [Plaintiffs] . . . an estimated cost for the Work . . . exceed[ing] the [TI Allowance]."  *Id.* at 32.  The Letter Agreement does not state that an Allowance Overage Deposit only triggers when the three pre-Work conditions are met.  *Id.*  It only specifies that Defendant

must provide Plaintiffs an estimated cost of the Work exceeding the TI Allowance before the Work commences. *Id.*

Yet the scope of the Work is "provided for in the Approved Plans." [DE 14-1] 30. Therefore, Defendant could not have created an "estimated cost for the Work" without access to the Approved Plans.[8] *Id.* at 30, 32. Again, Plans become Approved Plans when "approved in writing by [Defendant] and [Plaintiffs]." *Id.*

The parties dispute when, if ever, any Approved Plans existed. *See, e.g.*, [DE 75] 12–14; [DE 81] 8. It is undisputed that the May Plans were submitted to the City of Raleigh and that Defendant specifically rejected BNK's proposed MEP portion in writing and engaged a new firm to create an alternative HVAC plan. [DE 71] 5, 7 (citing [DE 72-32] 2); *see also* [DE 72-31] 5 (explaining Defendant had rejected BNK's "MEP drawings" from the "permitted set of plans" for the Space).

The only material alteration to the May Plans was switching BNK's proposed 7.5-ton and two 3-ton RTU HVAC system to Defendant's preferred three 5-ton RTU system. [DE 66] 9; [DE 72-31] 5. According to Defendant, these changes were not "finalize[d] . . . until August 2021."[9] [DE 81] 8. In support, Defendant cites to two budgets. *Id.* The first is the August Budget created by Defendant; the second (dated October 4, 2021) is from Callahan Construction. [DE 72-29] 8–9. Both contain HVAC replacement costs of $76,645.00, which reflects the three 5-ton RTUs Defendant preferred. *Id.* The record also reflects that, at minimum, BNK (the engineering firm retained by Plaintiffs' architect) knew Defendant's redesign of the May Plans reflected 3 five-ton RTUs earlier in August 2021. *See* [DE 72-32]. Indeed, BNK apparently sent Defendant a proposed MEP redesign including the three 5-ton RTUs versus the 7.5-ton and two 3-ton RTUs contained in the May Plans. *See id.* at 2.

Moreover, Plaintiffs' fundamental issue with Defendant's alteration to the May Plans is not the

---

[8] On the other hand, the Allowance Overage Deposit operates independently of the "construction schedule" condition, as both occur "[p]rior to the commencement of the Work[.]" [DE 14-1] 30, 32.

[9] Defendant elsewhere states that the upfit "plans were not finalized until May[,]" presumably referring to the May Plans submitted to Raleigh. [DE 70] 15.

17

switch from BNK's proposed HVAC system to Barrett Woodyard's. Instead, Plaintiffs claim they did not know until August 31, 2021 that "the open concept ceiling was going to create such a massive thing[,]" meaning monthslong upfit delays and leaving Plaintiffs on the hook for a six-figure increase in construction costs. [DE 72-5] 58. But Plaintiffs admit they received the "design plans" submitted to the City of Raleigh, and BNK created MEP drawings for the Space reflecting replacement RTUs. [DE 72-5] 57–58; [DE 72-20] 16–19 (containing "mechanical" floor plans, drawings of RTU details).

Taking the facts in the light most favorable to the Defendant, a reasonable jury could conclude that these written communications, conveying Defendant's switch to three 5-ton RTUs, amount to Approved Plans under the Work Letter. *See Anderson*, 477 U.S. at 248. If so, the August Budget could trigger the Allowance Overage Deposit provision. [DE 14-1] 32.

Plaintiffs also argue that Defendant's demand for an Allowance Overage Deposit was nonetheless invalid because the Work had already commenced. [DE 67] 24–26. The Work Letter unambiguously provides that an Allowance Overage Deposit may occur only "[p]rior to the commencement of the Work[.]" [DE 14-1] 32. It is undisputed that Defendant authorized some form of demolition work at the Space on May 27, 2021—more than three months before sending the August Budget. [DE 68-14] 1. But the court cannot determine as a matter of law that this demolition, undeniably "work" under its plain and ordinary meaning, falls under the "Work" term of art set out in the Work Letter. *See Jefferson-Pilot Life Ins. Co.*, 110 N.C. App. at 81–82. As discussed above, Approved Plans for the upfit—a prerequisite to knowing the scope of Work—may not have been finalized until three months after the demolition authorization. [DE 72-29] 8–9.

Accordingly, the court denies Plaintiffs' Motion on its breach of contract claim.

iii.     Bad Faith

Under North Carolina law, "every contract [contains] an implied covenant of good faith and fair dealing that neither party will do anything which injures the right of the other to receive the benefit of the agreement." *GB Grp., LLC v. Bulldog Nat'l Risk Retention Grp., Inc.*, No. 5:23-CV-00029-BO, 2023 WL

9514088, at *3 (E.D.N.C. Dec. 27, 2023) (quoting *Bicycle Transit Auth., Inc. v. Bell*, 314 N.C. 219, 228, 333 S.E.2d 299, 305 (1985)).  Plaintiffs premise their good faith claim on the same purported conduct underlying their breach of contract theory, essentially, that Defendant knew it would pass HVAC replacement costs to Plaintiffs but hid this information, Plaintiffs never contemplated paying these costs and then, once it was too late, Defendant used the Allowance Overage Deposit provision to force Plaintiffs to cover these costs.  [DE 14] 11–12.  A claim for breach of the implied covenant of good faith and fair dealing may depend on the same conduct as a breach of contract claim.  *See Cordaro v. Harrington Bank, FSB*, 260 N.C. App. 26, 38–39, 817 S.E.2d 247, 256–57 (2018).  North Carolina Courts treat a "claim for the implied covenant of good faith and fair dealing" as "part and parcel" of a "claim for breach of contract" when premised on the same conduct.  *Id*.

The same issues of material fact that prevent the court from ruling on Plaintiffs' breach of contract claim likewise preclude summary judgment on Plaintiffs' claim for breach of the implied covenant of good faith and fair dealing.  Thus, Plaintiffs' Motion fails on this claim.[10]

## V. **Defendant's Motion**

Defendant seeks summary judgment on Plaintiffs' Counts 1–4, as well as on Defendant's two counterclaims.  [DE 69].

The court has considered Plaintiffs' Count 1 (breach of contract) and determined that issues of material fact prevent an award of summary judgment in Plaintiffs' favor.  Specifically, the court identified two central questions of fact for jury resolution: which party was responsible for HVAC costs associated with the Space upfit, and were Plaintiffs obligated to pay an Allowance Overage Deposit.  These same questions directly inform Defendant's counterclaims for breach of the Lease and breach of the Guaranty.[11]

---

[10] Of course, any recovery for a breach of contract claim and a breach of implied covenant of good faith and fair dealing claim based on the same facts will not be double.  *See GB Grp., LLC*, 2023 WL 9514088 at *3 (citations omitted).

[11] Plaintiffs do not dispute that Dr. Dane signed the Guaranty.  [DE 66] 2.  However, Defendant's breach of Guaranty counterclaim wholly depends on its breach of contract claim and thus cannot be resolved at this stage.

Thus, the court denies summary judgment in Defendant's favor on Defendant's counterclaims and Plaintiffs' Count 1.

The court now considers Defendant's Motion regarding Plaintiffs' Counts 2–4.

**A.      UDTPA**

Plaintiffs' Count 3 is for unfair and deceptive trade practices.  [DE 14] 16–19.  N.C. Gen. Stat. § 58-63-15(11) does not include a private cause of action.  Nonetheless, a plaintiff may obtain relief for violations of N.C. Gen. Stat. § 58-63-15(11) under N.C. Gen. Stat. § 75-1.1 ("UDTPA").  *See, e.g.*, *Elliott v. Am. States Ins. Co.*, 883 F.3d 384, 396 (4th Cir. 2018).

Plaintiffs' allegations regarding Defendant's unfair and deceptive acts proceed along two tracks. [DE 14] 17–18.  First, that Defendant fraudulently induced Plaintiffs to sign the Lease by withholding information about the true upfit cost.  *Id*.  Second, and much like the allegations in Count 1, that Defendants later revealed this information, wrongfully demanded payment, and then refused to continue work on the upfit until Plaintiffs paid.  [DE 14] 17–18.

The elements of an unfair or deceptive trade practice are: "(1) an unfair or deceptive act or practice by [the] defendant, (2) in or affecting commerce, (3) which proximately caused actual injury to [the] plaintiff."  *Wilson v. Blue Ridge Elec. Membership Corp.*, 157 N.C. App. 355, 357, 578 S.E.2d 692, 694 (2003).  North Carolina courts distinguish "actions for unfair or deceptive trade practices . . . from actions for breach of contract."  *Heron Bay Acquisition, LLC v. United Metal Finishing, Inc.*, 245 N.C. App. 378, 382, 781 S.E.2d 889, 892 (2016) (quotations omitted).  "North Carolina courts are extremely hesitant to allow plaintiffs to attempt to manufacture a tort action and alleged [UDTPA claims] out of facts that are properly alleged as breach of contract claim." *Birtha v. Stonemor, N.C., LLC*, 220 N.C. App. 286, 298, 727 S.E.2d 1, 10 (2012) (quotations omitted).  Indeed, Plaintiffs must allege "some type of egregious or aggravating circumstances." *Carcano v. JBSS, LLC*, 200 N.C. App. 162, 171, 684 S.E.2d 41, 49 (2009) (citations omitted). Generally, "aggravating circumstances" include some form of deception, such as fraudulent inducements. *See Bailey v. Certain Interested Underwriters at Lloyd's London*, No. 4:21-CV-

20

159-D, 2023 WL 3513669, at *6 (E.D.N.C. May 17, 2023) (*citing Kerry Bodenhamer Farms, LLC v. Nature's Pearl Corp.*, No. 16 CVS 217, 2017 WL 1148793, at *7 (N.C. Super. Ct. Mar. 27, 2017)).

Plaintiffs' allegations fail to clear the "aggravating circumstances" bar. *Carcano*, 200 N.C. App. at 171. In support of their fraudulent inducement theory, Plaintiffs quote an alleged August 27, 2021, email from Defendant's attorney where he states that the "TI [A]llowance was never sufficient to cover the contemplated build out." [DE 14] 12–13. According to Plaintiffs, the email reveals Defendant concealed prior to signing the Lease that the "TI Allowance" was insufficient to cover the Space upfit. *Id*. And, moreover, that Defendants should have somehow alerted Plaintiffs—an adverse party to an arm's-length transaction—to this risky Lease term. That cannot be the law.

To succeed on a fraudulent inducement theory, Plaintiffs must show that there exists a "(1) [f]alse representation or concealment of a material fact, (2) reasonably calculated to deceive, (3) made with intent to deceive, (4) which does in fact deceive, (5) resulting in damage to the injured party." *Forbis v. Neal*, 361 N.C. 519, 526–27, 649 S.E.2d 382, 387 (2007) (quoting *Ragsdale v. Kennedy*, 286 N.C. 130, 138, 209 S.E.2d 494, 500 (1974)). Plaintiffs must also demonstrate actual reliance. *Id*. And since Plaintiffs allege wrongful concealment or nondisclosure, they must prove "that all or some of the defendants had a duty to disclose material information to [them] as silence is fraudulent only when there is a duty to speak." *Breeden v. Richmond Cmty. Coll.*, 171 F.R.D. 189, 194 (M.D.N.C.1997). But in North Carolina there is no general duty to disclose in an arms-length transaction. *See Pearson v. Gardere Wynne Sewell LLP*, 814 F. Supp. 2d 592, 605 (M.D.N.C. 2011). A narrow exception exists where Defendant took steps to conceal material information from Plaintiffs which Defendant knew Plaintiffs were unable to obtain. *Godfrey v. Res-Care, Inc.*, 165 N.C. App. 68, 75, 598 S.E.2d 396, 402 (2004).

This exception does not apply. It was Plaintiffs who proposed the $65.00 per square foot TI Allowance in the LOI, not the Defendant. [DE 71] 1. Plaintiffs settled on the $65.00 amount after internally

discussing price ranges with Mr. Cate.[12]  *Id*.  The LOI specifically proposes a "$65.00 PSF Tenant Improvement Allowance take space as is."  [DE 72-11].  It does not say this amount must satisfy the whole upfit cost.  *Id*.  And there is no evidence Plaintiffs were denied access to relevant material.  Indeed, the Plaintiffs signed the final Lease containing the provisions pertaining to the TI Allowance and responsibility for HVAC.  *See* [DE 14-1]; *see Triad Packaging, Inc. v. Supplyone, Inc.*, 597 Fed. Appx. 734, 740 (4th Cir. 2015) (finding that "normal deliberations and negotiations (and the corresponding adjustments in terms) that accompany a transaction of this nature" did not amount to aggravating circumstances).  And Defendant provided pre-Lease access to the Space so Plaintiffs could work on upfit budgets and plans.  *See, e.g.*, [DE 71] 2.

In sum, Defendant had no duty to inform Plaintiffs that the proposed TI Allowance might be insufficient, and Plaintiffs' UDTPA claim premised on fraudulent inducement fails.[13]  *See Pearson*, 814 F. Supp. 2d at 605 (dismissing fraud claim premised on late addition of provision to contract final draft without informing plaintiff); *cf. Godfrey*, 165 N.C. App at 75 (question of fact precluded dismissal of fraud claim where Plaintiff "repeatedly conditioned" contract on defendant not associating with competitor and defendant concealed ongoing negotiation with competitor).

Plaintiffs' alternative UDTPA theory hinges on Defendant's same alleged breaches of the Lease identified in Count 1.  [DE 14] 17–18.  Specifically, whether Defendant's August Budget and demand for an Allowance Overage Deposit amount to breach.  *Id*.  A "mere breach of contract, even if intentional, is not an unfair or deceptive act under [the UDTPA]."  *Bob Timberlake Collection, Inc. v. Edwards*, 176 N.C. App. 33, 41–42, 626 S.E.2d 315, 323 (2006).  For that reason, Plaintiffs' UDTPA claim premised on Defendant's alleged breaches of the Lease fail.

---

[12] At her deposition, Dr. Dane stated that she had personally budgeted $40,000.00 for any excess upfit costs above the TI Allowance.  [DE 72-4] 249.

[13] Plaintiffs had counsel review the Lease before signing.  Upon review, Plaintiffs' counsel apparently commented that the Lease was "super landlord friendly" and specifically alerted Dr. Dane to Plaintiffs' potential obligations under the Allowance Overage Deposit provision.  [DE 72-4] 246–47.

Summary judgment is warranted for Defendant on Plaintiffs' Count 3 (unfair and deceptive practices).

### B. Fraudulent Inducement

Plaintiffs' Count 2 for fraudulent inducement also centers on Defendant's alleged fraudulent omissions prior to the Lease signing regarding the "actual cost of the upfit" versus the TI Allowance specified in the Work Letter.[14] [DE 14] 12–16. Again, North Carolina courts do not recognize a general "duty to disclose in an arms-length transaction[,]" except when Defendant took steps to conceal material information Plaintiffs could not otherwise obtain. *Pearson*, 814 F. Supp. 2d at 605; *Godfrey*, 165 N.C. App. at 75; *see also Breeden*, 171 F.R.D. at 194 ("Silence, in order to be an actionable fraud, must relate to a material matter known to the party and which it is his legal duty to communicate to the other . . . party, whether the duty arises from a relation of trust, from confidence, inequality of condition and knowledge, or other attendant circumstances."). Plaintiffs must also show actual reliance. *Forbis*, 361 N.C. at 526–27. Plaintiffs' claim falls short.

Plaintiffs proposed the $65.00 TI Allowance to Defendant in a commercial lease transaction. [DE 71] 2. Both parties had counsel review the final Lease, [DE 72-4] 246–47, which integrated Plaintiffs' proposed TI Allowance and made Plaintiffs responsible for any upfit costs exceeding that amount. [DE 14-1] 30, 32. Plaintiffs admitted they knew there was a possibility the TI Allowance would not cover the whole Space upfit. *See, e.g.*, [DE 72-4] 249. Plaintiffs' real estate agent Mr. Cate, who assisted Plaintiffs with creating the proposed TI Allowance, acknowledged in his deposition that it is "rare" for a TI Allowance to cover all upfit costs. [DE 71] 2; [DE 72-2] 59. And the record reflects that Plaintiffs had the opportunity prior to signing the Lease to investigate the Space for creating draft upfit budgets and plans. *See, e.g.*, [DE

---

[14] Plaintiffs also state "upon information and belief" that Defendant represented its willingness to bear the cost of replacing the RTUs but does not specify who made this representation or when. [DE 14] 14. In alleging a fraud claim, a party "must state with particularity the circumstances constituting fraud." *Joy v. MERSCORP, Inc.*, 935 F. Supp. 2d 848, 861 (E.D.N.C. 2013) (citing Fed. R. Civ. P. 9(b); *Learning Works, Inc. v. The Learning Annex, Inc.,* 830 F.2d 541, 546 (4th Cir. 1987)).

71] 2. Plaintiffs have not presented evidence to support either that Defendant actively concealed any "material" information that they could not themselves obtain, nor that Plaintiffs reasonably relied on those alleged omissions.

For these reasons, the court grants summary judgment on Plaintiffs' Count 2.

### C. *Punitive Damages*

Plaintiffs' Count 4 is for punitive damages pursuant to N.C. Gen. Stat. § 1D-15. North Carolina does not recognize a "cause of action" for punitive damages. Therefore, "[i]f the injured party has no cause of action independent of a supposed right to recover punitive damages, then he has no cause of action at all." *Hawkins v. Hawkins,* 101 N.C. App. 529, 532, 400 S.E.2d 472, 474 (1991) (quoting J. Stein, *Damages and Recovery* § 195 at 389 (1972)). Punitive damages require a showing of an "aggravating factor" giving rise to the punitive damages, specifically "(1) fraud, (2) malice, or (3) willful or wanton conduct." N.C. Gen Stat. § 1D-15(a).

The court has found summary judgment in Defendant's favor on Plaintiffs' claims sounding in fraud (Counts 2 and 3). Plaintiffs' request for punitive damages thus fails as a matter of law since Plaintiffs have failed to establish any "aggravating factor" to support such an award. *See Team 7, LLC v. Protective Sols.*, Inc., 759 F. Supp. 2d 698, 706 (E.D.N.C. 2010) (denying request for punitive damages after dismissing plaintiff's tort claims).

**VI.**    **Conclusion**

Based on the foregoing, the court orders as follows:

1.     Plaintiffs` Motion [DE 65] is DENIED.

2.     Defendant`s Motion [DE 69] is GRANTED IN PART and DENIED IN PART, specifically:

     a.     GRANTED as to Plaintiffs` Counts 2–4; and

     b.     DENIED as to Plaintiffs` Count 1 and Defendant`s counterclaims.

SO ORDERED this ___11th___ day of February, 2025.

Richard E Myers II

RICHARD E. MYERS II
CHIEF UNITED STATES DISTRICT JUDGE